# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL DILLMAN, an individual, and, STEPHEN DILLMAN, an individual,** | **1:13-CV-00404 LJO SKO** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION TO DISMISS (DOC. 9)** |
| **v.** | |
| **TUOLUMNE COUNTY, a political subdivision of the State of California; DEPUTY DAVID VASQUEZ, an individual, and DOES 1-25, inclusive,** | |
| **Defendants.** | |

## I. PRELIMINARY STATEMENT TO PARTIES AND COUNSEL

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Diane Feinstein and Barbara Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout the nation to serve as visiting judges. In the absence of Magistrate Judge consent, this action is subject to reassignment to a U.S. District Judge from outside the Eastern District of California.

## II. INTRODUCTION

This case concerns the September 18, 2011 arrest of Plaintiffs Michael and Stephen Dillman for alleged "joyriding" and related offenses in connection with their use of a thirteen-foot aluminum fishing boat on Lake Donnell, in Tuolumne County. The Complaint's first cause of action, brought under 42 U.S.C. § 1983, alleges that Defendants Tuolumne County (the "County") and Tuolumne County Sheriff's Deputy David Vasquez violated Plaintiffs' federal constitutional rights by, among other things: (1) subjecting both Plaintiffs to unreasonable force in connection with their arrest; (2) subjecting Michael Dillman to a strip search and other "outrageous humiliation" during the booking process; (3) and singling Michael Dillman out for such a "degrading and humiliating" strip search in part because he "was an ordained pastor accused of a crime." Doc. 1, First Amended Compl. ("FAC"), at ¶ 35-41. The Complaint also contains the following related state law claims:

- Violation of California's Bane Civil Rights Act, Cal. Civ. Code § 52.1, against all Defendants (Second Cause of Action);

- Battery against Defendant Vasquez  (Third Cause of Action);

- Intentional Infliction of Emotional Distress against Defendant Vasquez and "certain yet to be named individual defendants" (Fourth Cause of Action);

- Negligence against Defendant Vasquez and "certain yet to be named individual defendants" (Fifth Cause of Action); and

- Violation of California Penal Code § 4030 against the County and "certain yet to be named individual defendants" (Sixth Cause of Action).

FAC at 14-19.

The Complaint was originally filed in the Superior Court for the County of Tuolumne on February 13, 2013, but was removed by Defendants on March 18, 2013 pursuant to 28 U.S.C. §§ 1441(a) and 1446(a). Doc. 1. Defendants Vasquez and the County now move to dismiss. Doc. 9. Plaintiff opposes dismissal, Doc. 11, and requests judicial notice of several documents, Doc. 10. Defendants replied. Doc. 12. The hearing was vacated and the matter taken under submission on the

2

papers pursuant to Local Rule 230(g). Doc. 13.

### III. <u>BACKGROUND</u>[1]

On September 18, 2011, after conducting Sunday morning service at his church in Manteca, Pastor Michael Dillman, and his son, Stephen Dillman, drove to Lake Donnell in Tuolumne County, California, to go fishing. FAC ¶ 10. As was their custom and practice over the years, Plaintiffs placed their own motor on a thirteen-foot Valco aluminum boat at Lake Donnell. FAC ¶ 11. There was no registration, insignia, or identification on the boat. *Id*. According to Plaintiffs, for the last thirty years they and other fisherman have left aluminum boats moored at Lake Donnell, and it has been common practice to pack in one's own motor, place it on one of the moored boat, take the boat fishing, and then return the boat to the dock. *Id*. In fact, in or around 2010 Michael Dillman purchased an aluminum boat identical to the boat Plaintiffs used on September 18, 2011, and left that boat at Lake Donnell for his own use and for use by other fishermen. *Id*. Two aluminum boats purchased by Plaintiffs are moored currently at Lake Donnell. *Id*.

While Plaintiffs were out on Lake Donnell on September 18, 2011, an employee of Tri-Dam Project, the entity that operates the facility at Lake Donnell, called the Tuolumne County Sheriff's Department to report seeing two unidentified men place a motor on an aluminum boat that allegedly belonged to Tri-Dam Project. FAC ¶ 12. The men then took the boat out fishing. *Id*. The Tri-Dam Project employee viewed these events on surveillance cameras at Lake Donnell. *Id.*

After returning from fishing, Plaintiffs were met by Defendant Tuolumne County Sheriff's Deputy David Vasquez, who ordered them up a ladder at the dam facility and informed them they were under arrest for joyriding in a boat, trespass, and vandalism. FAC ¶ 13. Defendant Vasquez then handcuffed Plaintiffs with their hands behind their backs, in a "high, tight and painful manner." *Id* Michael Dillman explained to Deputy Vasquez that he was a pastor, a community leader, and that he was unarmed and posed no threat to him. *Id*. Michael Dillman also explained to Deputy Vasquez that he

---

[1] These background facts are drawn exclusively from the FAC, the truth of which must be assumed for purposes of a Rule 12(b)(6) motion to dismiss.

was a Vietnam War veteran and suffered from Post-Traumatic Stress Disorder ("PTSD") and extreme claustrophobia. *Id.* At the time of the incident, Michael Dillman was 63 and suffered from arthritic shoulder pain, which was exacerbated by the high and tight handcuff placement behind his back. *Id.* Upon being cuffed, he began to feel pain immediately, which escalated to "an excruciating level." *Id.*

Michael Dillman pled with Deputy Vasquez to cite and release him and his son and to refrain from placing them into the back of the police vehicle with their arms cuffed behind their backs. FAC ¶ 14. Michael Dillman told Deputy Vasquez that he feared if he were placed in such a position in the back of a vehicle with the windows rolled up, he would suffer a PTSD episode. *Id.* He pled with Deputy Vasquez to loosen the cuffs to reduce the pain or to cuff him in front and to crack the window in the back of the vehicle so he could get air. *Id.* Deputy Vasquez finally agreed to "double cuff" Michael Dillman; however, his hands remained behind his back and the cuffs were extremely tight on his wrists. *Id.*

Plaintiffs were "shoved" into the back of Deputy Vasquez's vehicle and immediately transported to the Tuolumne County Jail in Sonora, California, over an hour drive from Lake Donnell. FAC ¶ 15. A portion of the drive was on a bumpy road and both men were cuffed behind their backs in an extremely painful manner. *Id.* Plaintiff Michael Dillman continued to plead with Deputy Vasquez to crack the window and loosen his handcuffs. *Id.* Instead of doing so, Deputy Vasquez cursed Plaintiff Michael Dillman and threatened to "hog tie his ass!" *Id.* Plaintiff Michael Dillman then suffered a "PTSD episode" during the transport to the Tuolumne County Jail. *Id.*

According to Plaintiffs, when they arrived at the Tuolumne County Jail they were cursed and humiliated by Tuolumne County Sheriff's Department personnel. FAC ¶ 16. Plaintiffs claim that Michael Dillman was called a "psycho preacher" and was forced to completely undress in the presence of two female deputies, who openly commented on his nakedness. *Id.* Stephen Dillman was not strip-searched. *Id.* Michael Dillman was then separated from his son and placed naked in a small padded cell on cold concrete and given no way to cover himself from his nakedness or protect himself from the cold. *Id.* After approximately two hours in that padded cell, Michael Dillman was returned to the holding cell

with his son. *Id.*

Plaintiffs were released from custody at approximately 1:00 a.m. on September 19, 2011. FAC ¶ 17. According to Plaintiffs, Jail personnel refused to return money that had been confiscated from them during the booking process. *Id.* Instead, Plaintiffs were given a voucher card, which required them to wait until the banks opened in the morning before they could access any money. *Id.*

Tuolumne County chose to prosecute Plaintiffs, and a criminal jury trial commenced on February 6, 2012. FAC ¶ 18. Plaintiffs were acquitted of all charges. *Id.*

## IV. <u>STANDARD OF DECISION</u>

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions ... amount[ing] to nothing more than a 'formulaic recitation of the elements'... are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## V. DISCUSSION

**A.      Section 1983 Claim.**

The First Cause of Action alleges that all Defendants violated Title 42, United States Code, section 1983 ("Section 1983"). Section 1983 creates a cause of action "against any person acting under color of law who deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). The Complaint alleges Defendant Vasquez and the County violated Plaintiffs' First, Fourth, and Fourteenth Amendments rights.

**1.      Section 1983 Claims Against Defendant Vasquez.**

**a.      Probable Cause for Arrest.**

The Fourth Amendment requires that a warrantless arrest be supported by probable cause. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed ... an offense." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (internal quotation and citation omitted). In determining whether there was probable cause to arrest, a court must look to "the totality of circumstances known to the arresting officers, [to determine if] a prudent person would have concluded there was a fair probability that [the defendant] had committed a crime." *Id*.

In most cases, in establishing probable cause, "officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). For example, the complaint in *Arpin* survived a motion to dismiss where the arrestee alleged that the arresting officer "refused to identify himself, would not inform [the arrestee] of the reason she was being arrested, and did not allow [her] to explain her side of the story prior to arresting her." *Id.* Likewise, in *Hopkins v. Bonvicino*, 573 F.3d 752, 767 (9th Cir. 2009), an eye-witness testified that Hopkins caused a minor automobile collision, his breath smelled of alcohol, he appeared intoxicated, and he ran into a nearby house. On that basis, the police entered Hopkins' house to arrest him. *Id*. Noting that the police failed to interview anyone else and did nothing to corroborate the witness' account, the Ninth Circuit concluded that the witness' "cursory and conclusory," statements "without further investigation by the police," were "insufficient to support probable cause." *Id*. However, corroborating evidence is not absolutely required in every instance. Probable cause may be based upon a victim's statement alone "if the victim provides facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator." *Peng v. Mei Chin Penghu*, 335 F.3d 970, 978 (9th Cir. 2003) (internal quotation omitted).

"As a corollary ... of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (internal quotation omitted); *see also Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988) (holding that even though an initial report that a suspect had committed a kidnapping might have established probable cause, because the officer received exculpatory information before arresting the suspect, a reasonable officer would have investigated further before making the arrest); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("An officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when 'minimal further investigation' would have exonerated the suspect.") (internal citations omitted); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that

would help clarify the circumstances of the arrest. Reasonable avenues of investigation must be pursued especially when ... it is unclear whether a crime had even taken place."). Yet, once probable cause is established, a law enforcement officer is not "required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." *See Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) (discussing obligations of officers executing a valid arrest warrant).

Because Plaintiffs bear the ultimate burden of proving the absence of probable cause, *Beck v. City of Upland*, 527 F.3d 853, 864 (9th Cir. 2008), they must allege factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, *see Iqbal*, 556 U.S. at 678. While the FAC does allege that Plaintiffs were subjected to excessive force and that Michael Dillman was the victim of an unreasonable strip search, the FAC does not directly allege that Deputy Vasquez lacked probable cause to arrest Plaintiffs, nor does it directly assert that Deputy Vasquez performed an insufficient investigation. Rather, Plaintiffs argue in their opposition that a reasonable inference can be drawn from the alleged facts that Deputy Vasquez immediately arrested both Plaintiffs with no further investigation of the true ownership of the boat or of common practice among fishermen at Lake Donnell. Doc. 11-1 at 7.

Plaintiffs concede in the FAC that an employee of Tri-Dam called the Tuolumne County Sheriff's Department to report seeking two unidentified men placing a motor on an aluminum boat the employee claimed belonged to Tri-Dam and then taking that boat out onto the lake. FAC ¶ 12. The employee viewed this conduct on surveillance cameras at Lake Donnell. *Id*. After returning from fishing, Plaintiffs were met by Deputy Vasquez, who informed them they were under arrest for joyriding, trespass, and vandalism. FAC at ¶ 13. The conduct reported to Deputy Vasquez by the Tri-Dam employee conforms to the statutory definition of joyriding set forth in California Penal Code § 499b:

> Any person who shall, without the permission of the owner thereof, take any vessel for the purpose of temporarily using or operating the same, is guilty of a misdemeanor....

Plaintiffs allege that it has been the longstanding practice of fishermen at Lake Donnell to leave aluminum boats moored at the lake for communal use:

> For the last thirty (30) years Plaintiffs and other fisherman have left aluminum boats moored at Lake Donnell and the local practice has always been to pack in one's own motor and place it on an anticipated moored boat, and then commandeer the boat, fish, and then return the boat to the dock after fishing.  In fact, in or around 2010 Plaintiff MICHAEL DILLMAN had purchased a 13' Valco aluminum boat identical to the boat that Plaintiffs used on September 18, 2011, and had left such boat at Lake Donnell for his own use and for use by other fishermen.  Plaintiffs currently have two (2) aluminum boats moored at Lake Donnell.

FAC at ¶ 11. However, the Complaint fails to indicate that Plaintiffs informed Deputy Vasquez of this longstanding practice. Unless Deputy Vasquez was aware of this information, he cannot be faulted for failing to investigate the matter further.

The FAC also alleges that the boat Plaintiffs utilized bore no registration, insignia, or identification. *Id.* Viewing the facts in the FAC in a light most favorable to Plaintiffs, given the lack of registration or markings, it was not possible for Deputy Vasquez to confirm that someone other than Plaintiffs owned the boat, an element of joyriding.[2] A finder of fact might conclude that it was unreasonable for Deputy Vasquez to arrest Plaintiffs without first confirming Tri-Dam's ownership of the boat. *See Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 671 (8th Cir. 2007) (finding probable cause where officer performed at least cursory investigation into ownership of allegedly stolen boat). Defendants' motion to dismiss any claim based upon arrest without probable cause is DENIED.

### b.   <u>Failure to Cite and Release.</u>

The FAC also alleges that Plaintiffs requested that Deputy Vasquez cite and release, rather than arrest, them. FAC ¶ 14. There is no authority to support a Section 1983 claim based upon this conduct. In California, it is within a law enforcement officer's discretion to determine whether to arrest an individual on a misdemeanor offense. *See Peterson v. Union Pac. R. Co.*, 480 F. App'x 874, 875 (9th Cir. 2012) (explaining that California Penal Code § 853.6 allows an officer to "book the arrested person

---

[2] In Reply, Defendants acknowledge the allegation that the boat had no identifying markings but seem to argue, inexplicably, that this fact contributes to a finding of probable cause that Plaintiffs were joyriding. Doc. 12 at 3. The Court cannot understand this assertion, as taking a vessel <u>without permission of its owner</u> is part of the statutory definition of joyriding.

9

at the scene or <u>at the arresting agency</u> prior to release" on a misdemeanor charge); *Washburn v. Fagan*, 331 F. App'x 490, 492 n. 1 (9th Cir. 2009) (rejecting section 1983 challenge to reasonableness of arrest where officers declined to cite misdemeanor arrestee in the field and instead brought him to the station for booking, finding this conduct in conformity with California law).

Defendants' motion to dismiss any section 1983 claim based upon Deputy Vasquez's refusal to cite and release Plaintiffs is GRANTED WITHOUT LEAVE TO AMEND, as amendment would be futile.

### c.   Excessive/ Unreasonable Use of Force (Handcuffing).

Plaintiffs allege that Deputy Vasquez's "conduct in the handcuffing and transporting of Plaintiffs to the Tuolumne County Jail violated Plaintiffs' Constitutional rights under the Fourth Amendment to be free from excessive force." FAC ¶ 36. Claims of excessive force in the course of an arrest are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. When determining whether the totality of the circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citations omitted). Determining whether force is reasonable requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id*. at 396 (citation omitted).

### (1)   Stephen Dillman.

The FAC alleges that Deputy Vasquez applied handcuffs to Stephen Dillman before transporting him and his father to Tuolumne County Jail. FAC ¶ 13. The mere application of handcuffs during the

1  course of an arrest does not, in and of itself, give rise to a section 1983 claim for excessive force. The

2  right to make an arrest carries with it the right to use "some degree of physical coercion." *Graham*, 490

3  U.S. at 396. In *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the Supreme Court held that a

4  motorist's Fourth Amendment rights were not violated when she was arrested, handcuffed, and

5  transported to jail for failing to fasten her children in seat belts. While her arrest and subsequent booking

6  were "inconvenient and embarrassing," they were not so extraordinary as to violate the Fourth

7  Amendment. *Id.* at 355.[3]

8         The FAC also alleges that Deputy Vasquez applied handcuffs to Stephen Dillman in a "tight and

9  painful manner" before transporting him to Tuolumne County Jail. FAC ¶ 13. The FAC further indicates

10 that Stephen Dillman "in no way consented to [his] arrest and subsequent painful handcuffing," FAC ¶

11 39, and that Stephen Dillman "was harmed by Defendant Vasquez's conduct but did not seek medical

12 attention," FAC ¶ 48. However, unlike his father, Stephen Dillman did not complain to Deputy Vasquez

13 that his handcuffs were too tight.

14        The Ninth Circuit has held that excessively tight handcuffing can constitute a Fourth

15 Amendment violation, but only where a plaintiff claims to have been demonstrably injured by the

16 handcuffs or where complaints about the handcuffs being too tight were ignored. *Compare Wall v.*

17 *County of Orange*, 364 F.3d 1107, 1109-12 (9th Cir. 2004) (arrestee suffered nerve damage as a result of

18 continued restraint in tight handcuffs); *LaLonde v. County of Riverside*, 204 F.3d 947, 952, 960 (9th Cir.

19 2000) (arrestee complained to officer who refused to loosen handcuffs); *Palmer v. Sanderson*, 9 F.3d

20 1433, 1434-36 (9th Cir. 1993) (arrestee's wrists were discolored and officer ignored his complaint), with

21 *Hupp v. City of Walnut Creek*, 389 F. Supp. 2d 1229, 1233 (N.D. Cal. 2005) (denying summary

22 _____

23 [3] Plaintiffs' contention that this case is more like *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), is totally misplaced.
   In that case, several police cruisers followed arrestee's vehicle before officers ordered them out of their vehicle at gunpoint,

24 handcuffed them, and placed them in separate police vehicles. At issue in that case was whether such conduct constituted a
   *Terry* stop or an arrest, not whether excessive force was applied. Finding the incident constituted an "arrest," the Ninth

25 Circuit noted that "[i]n this nation, all people have a right to be free from the terrifying and humiliating experience of being
   pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such

26 intrusive police conduct exists." *Id.* at 1187. This reasoning has absolutely no bearing on the question presented here:
   whether an officer's use of handcuffs during the course of what indisputably was an arrest violates the Fourth Amendment.

judgment in the absence of "evidence of a physical manifestation of injury or of a complaint about tight handcuffs that was ignored"); *Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (refusing to find a constitutional violation where officers immediately acted after arrestee complained that handcuffs were too tight).

Although at the pleading stage a plaintiff need only allege facts that would give rise to a reasonable inference that he is entitled to relief, the FAC alleges no specific facts concerning the nature of any injuries suffered by Stephen Dillman, nor does the FAC allege he complained about tight handcuffs and was ignored.

The FAC references Section 354.2 of the Tuolumne County Sheriff's Policy Manual, which sets forth a policy regarding handcuffing:

> 20.    Plaintiffs are further informed, believe and thereon allege that at all times mentioned herein the Tuolumne County Sheriff's Department had in place §§ 354.2 and 354.2.1 of the Tuolumne County Sheriff's Policy Manual which outlines the department's handcuffing policy and the improper use of handcuffs as follows:
>
> > a.    Pursuant to § 354.2 of the Tuolumne County Sheriff's Policy Manual, there is no mandatory handcuff policy for detainees and it is a discretionary procedure.
> >
> > b.    Pursuant to § 354.2, when deciding whether to handcuff an arrestee, the deputy should carefully balance (emphasis added) officer safety concerns with factors including the following:
> >
> > - The circumstances leading to the arrest.
> > - The attitude and behavior of the arrested person.
> > - The age, sex and health of the person.
> > - Whether the person has any other apparent disability.
> >
> > c.    While it is not the intent of § 354.2 to dissuade deputies from handcuffing all persons they believe warrant that degree of restraint, nevertheless it is also not the intent of the policy to create an atmosphere that in order to avoid risk, a deputy should handcuff all persons regardless of the circumstances.
> >
> > d.    Pursuant to § 354.2.1 of the Tuolumne County Sheriff's Policy Manual, handcuffing should never be done to punish, to display authority, or as a show of force. Persons are handcuffed only to restrain their hands to ensure officer safety. When practical, handcuffs shall be double locked to prevent tightening which may cause undue discomfort or injury to the hands and wrists.

FAC ¶ 20. Even assuming, as the Court must on a Rule 12(b)(6) motion, that this accurately describes

1   Tulare County policy, the policy does not determine the relevant standards to be applied to a Section

2   1983 claim. Section 1983 provides a civil action against state actors who violate <u>federal</u> constitutional or

3   <u>federal</u> statutory rights, not state law or local law enforcement policies. *See* 42 U.S.C. § 1983; *Galen v.*

4   *County of Los Angeles*, 477 F.3d 652, 662 (9th Cir. 2007). Stephen Dillman has not alleged facts giving

5   rise to a constitutional violation in connection with his handcuffing.

6       Accordingly, Defendants motion to dismiss Stephen Dillman's excessive force claim is

7   GRANTED WITH LEAVE TO AMEND.

8             **(2)**    **Michael Dillman.**

9       Michael Dillman did complain to Deputy Vasquez that his handcuffs were too tight. According

10  to the FAC, Vasquez responded to the first complaint by double-cuffing him, but ignored the second

11  complaint:

12      13.     After returning from fishing for just over an hour, Plaintiffs were met by
    Defendant Tuolumne County Sheriff's Deputy DAVID VASQUEZ who ordered them up

13  a ladder at the dam facility and informed them they were under arrest for joy riding in a
    boat, trespass, and vandalism. <u>Defendant VASQUEZ then handcuffed Plaintiffs hands</u>

14  <u>behind their backs, in a high, tight and painful manner.</u> Plaintiff MICHAEL DILLMAN
    explained to Defendant VASQUEZ that he was a pastor, a community leader, and that he

15  was unarmed and posed no threat to him. Plaintiff MICHAEL DILLMAN also explained
    to Defendant VASQUEZ that he was a Vietnam war veteran and suffered from Post

16  Traumatic Stress Disorder ("PTSD") and extreme claustrophobia. <u>At the time of the</u>
    <u>incident, Plaintiff MICHAEL DILLMAN was a 63-year-old man who suffered from</u>

17  <u>arthritic shoulder pain, which was exacerbated by the high and tight handcuff placement</u>
    <u>behind his back. Upon being cuffed, he began to feel pain immediately, which escalated</u>

18  <u>to an excruciating level.</u>

19      14.     <u>Plaintiff MICHAEL DILLMAN pled with Defendant VASQUEZ to cite and</u>
    <u>release him and his son and to refrain from placing them into the back of the Defendant</u>

20  <u>VASQUEZ vehicle with their arms cuffed behind their backs.</u> Plaintiff MICHAEL
    DILLMAN told Defendant VASQUEZ that he feared if he were placed in such a position

21  in the back of a vehicle with the windows rolled up, he would suffer a PTSD episode. <u>He</u>
    <u>pled with Defendant VASQUEZ to loosen the cuffs to reduce the pain or to cuff him in</u>

22  <u>front and to crack the window in the back of the vehicle so he could get air.</u> Defendant
    <u>VASQUEZ finally agreed to "double cuff" Plaintiff MICHAEL DILLMAN, however his</u>

23  <u>hands remained behind his back and the cuffs were extremely tight on his wrists.</u>

24      15.     Plaintiffs were not permitted to secure their camp site, their fishing equipment,
    their vehicle, or their motorcycle and instead were shoved into the back of <u>Defendant</u>

25  <u>VASQUEZ's vehicle and immediately transported to the Tuolumne County jail in</u>
    <u>Sonora, California, which was over an hour drive from Lake Donnell. A portion of the</u>

26  <u>drive was on a bumpy road and both men were cuffed behind their backs in an extremely</u>

1

> painful manner.  Plaintiff MICHAEL DILLMAN continued to plead with Defendant VASQUEZ to crack the window and loosen his handcuffs.  Instead of doing so, Defendant VASQUEZ cursed Plaintiff MICHAEL DILLMAN and threatened to "hog tie his ass!"  As feared, Plaintiff MICHAEL DILLMAN suffered a PTSD episode during the transport to the Tuolumne County jail.

2

3

4   FAC ¶¶ 14-15. Michael Dillman claims to have sought medical treatment for injuries sustained as a

5   result of Defendant Vasquez's conduct. FAC ¶ 48. Michael Dillman's alleged injuries and the allegation

6   that Deputy Vasquez ignored his second complaint about the handcuffs are sufficient, for pleading

7   purposes, to state a Section 1983 claim for excessive force. Defendants' motion to dismiss Michael

8   Dillman's excessive force claim is DENIED.

9            **d.    Deliberate Indifference to Medical Needs.**

10           The FAC also alleges Deputy Vasquez ignored Michael Dillman's history of PTSD and

11  "extreme claustrophobia" by, among other things, confining him in the back of the police car without

12  opening the window and threatening to "hog tie" him.

13           As to the threat to "hog tie" Michael Dillman, even if such a threat was made, a mere threat is

14  insufficient to state a claim under Section 1983. *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987)

15  ("We find no case that squarely holds a threat to do an act prohibited by the Constitution is equivalent to

16  doing the act itself.").

17           Deputy Vasquez's alleged refusal to make accommodations for Michael Dillman's PTSD and

18  claustrophobia requires additional analysis. Prolonged detention in a hot, unventilated police car may

19  amount to a Fourth Amendment violation because "unnecessary exposure to heat" may be objectively

20  unreasonable under certain circumstances. *Compare Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir.

21  2002) (denying summary judgment where arrestee was detained in unventilated police car in ninety

22  degree heat for three hours), *with Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (finding no

23  constitutional violation where arrestee claimed detention in unventilated vehicle placed in the sun

24  exacerbated her multiple sclerosis, given that officer offered to take her to the hospital and evidence

25  suggested detention was only approximately half an hour in length). Here, the FAC does not allege that

26  the police car in which Plaintiffs were transported was particularly hot or otherwise unventilated. Rather,

14

1   the allegation concerns Michael Dillman's psychological conditions, which made him particularly

2   sensitive to the circumstances. This is more akin to a claim that Deputy Vasquez ignored Michael

3   Dillman's medical needs.

4          Because a pretrial detainee has not been convicted of a crime, but has only been arrested, the

5   detainee's right to receive adequate medical care derives from the Due Process Clause of the Fourteenth

6   Amendment rather than from the Eighth Amendment's protection against cruel and unusual punishment.

7   *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002). Nonetheless, the Due

8   Process Clause imposes, at a minimum, the same duty to provide adequate medical care to those

9   detained as imposed by the Eighth Amendment: "persons in custody have the established right to not

10  have officials remain deliberately indifferent to their serious medical needs." *Id.* at 1187 (internal

11  quotation omitted). Accordingly, courts evaluating a pretrial detention medical needs claim routinely

12  rely on decisions applying the Eighth Amendment standards for claims of inadequate medical care to

13  convicted prisoners. *See, e.g.*, *id.*

14         Under the Eighth Amendment's standard of deliberate indifference, a person is liable for
       denying a prisoner needed medical care only if the person knows of and disregards an
15     excessive risk to inmate health and safety. In order to know of the excessive risk, it is not
       enough that the person merely be aware of facts from which the inference could be drawn
16     that a substantial risk of serious harm exists, he must also draw that inference. If a person
       should have been aware of the risk, but was not, then the person has not violated the
17     Eighth Amendment, no matter how severe the risk. But if a person is aware of a
       substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious
18     medical needs on the basis of either his action or his inaction.

19  *Id.* at 1187-88 (internal citations omitted).

20         Deliberate indifference requires the plaintiff to show (1) "a serious medical need by

21  demonstrating that failure to treat a prisoner's condition could result in further significant injury or the

22  unnecessary and wanton infliction of pain," and (2) "the defendant's response to the need was

23  deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations

24  omitted). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain

25  or possible medical need, and harm caused by the indifference." *Id.* Deliberate indifference may be

26  manifested when officials "deny, delay or intentionally interfere with medical treatment." *Id.*

1  "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.

2  2004). Indifference to "medical needs must be substantial"; "[m]ere indifference, negligence, or medical

3  malpractice will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460

4  (9th Cir. 1980). "Isolated occurrences of neglect" do not rise to the level of an Eighth Amendment

5  violation. *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990).

6       PTSD has been held to constitute a serious medical condition. *Bloodworth v. Krall*, 2011 WL

7  1043726, *4 (S.D. Cal. Mar. 22, 2011). The FAC alleges that Michael Dillman made Deputy Vasquez

8  aware that he suffered from this condition, FAC ¶ 13, and that placement in the back of the police car

9  handcuffed with the windows rolled up might cause a PTSD "episode," FAC ¶ 14. The FAC further

10  alleges that Michael Dillman requested that Vasquez make accommodations for his PTSD (e.g., rolling

11  down the window and/or application of a different handcuffing procedure), which were refused. For

12  pleading purposes, this is sufficient to allege "a purposeful act or failure to respond to a prisoner's pain

13  or possible medical need." The FAC also alleges Michael Dillman was harmed by Vasquez's conduct

14  because he suffered a PTSD "episode" during his transport to Tuolumne County Jail and subsequently

15  suffered "a complete regression in his PTSD coping skills, which necessitated him being placed in an

16  inpatient facility to deal with his PTSD and severe depression as a direct and proximate result of the

17  incident that is the subject of this lawsuit." FAC ¶ 31.

18       Defendants' motion to dismiss any section 1983 claim based upon Deputy Vasquez's alleged

19  refusal to address Michael Dillman's PTSD is DENIED.

20       **e.**    **Strip Search.**

21       The section 1983 claim alleges that the strip search of Michael Dillman violated his Fourth

22  Amendment right to be free from an unreasonable search of his person. FAC ¶ 37. The FAC also alleges

23  that the strip search violated Michael Dillman's Fourteenth Amendment rights to "due process of law

24  and equal protection, in that he and his son were both pre-trial detainees arrested on suspicion of the

25  same non-violent misdemeanors… and yet only Plaintiff [Michael Dillman] was singled out to be

26  subjected to the humiliating strip search and naked confinement…."  FAC ¶ 38. Finally, the FAC alleges

16

Michael Dillman "was singled out for the degrading and humiliating strip search in part because he was an ordained pastor accused of a crime," in violation of his First Amendment right "to the free expression and observance of his religious convictions." *Id.*

Personal liability under section 1983 "arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Here, the Complaint does not allege that Deputy Vasquez had any involvement in the strip search. Plaintiffs do not dispute that Vasquez had no involvement in the strip search. Defendants' motion to dismiss any such claim against Defendant Vasquez is GRANTED WITHOUT LEAVE TO AMEND, as amendment would be futile.

## 2.      Section 1983 Claims Against the County.

Defendants move to dismiss any claims against the County, arguing that Plaintiff has failed to satisfy the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), which provides that a municipality cannot be liable under § 1983 on a *respondeat superior* theory (i.e., simply because it employs someone who deprives another of constitutional rights). Rather, liability only attaches where the municipality itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694. Therefore, municipal liability in a § 1983 case may be premised upon: (1) an official policy; (2) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the act of an "official whose acts fairly represent official policy such that the challenged action constituted official policy"; or (4) where "an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

Plaintiffs point to Paragraphs 28 and 29 of the FAC, which allege:

> 28.      Plaintiffs are further informed, believe and thereon allege that the actions of the Tuolumne County Sheriff's Department personnel who detained and abused Plaintiffs involved excessive force and unreasonable search, <u>and were taken with deliberate indifference pursuant to an authorized and ratified pattern, practice and/or custom of disregarding Tuolumne County Sheriff's Department's own stated policies and procedures,</u> including, but not limited to, the application of metal handcuffs and strip searches thereby subjecting the public to the kinds of injuries and damages complained of

herein.

29.     Plaintiffs are further informed, believe and thereon allege that administrative and supervisory personnel of the [] Tuolumne County Sheriff's Department personally participated in the culture of the Tuolumne County Sheriff's Department by not taking effective steps to terminate the pattern, practice and/or custom of disregarding appropriate compliance with applicable law and the Tuolumne County Sheriff's Department's own stated policies and procedures, by failing to administer appropriate discipline, and by not properly hiring, training or supervising the personnel for which they were responsible for with regard to compliance with Tuolumne County Sheriff's Department's policies and procedures and Constitutional and statutory limits of the exercise of authority.  The conduct of the Tuolumne County Sheriff's Department administrative and supervisory personnel as set forth herein constitutes deliberate and gross negligent indifference toward the Constitutional rights of Plaintiffs.

These paragraphs appear to be alleging both a "pattern and practice" claim and a "failure to train" claim.

### a.     Pattern and Practice.

The FAC alleges that a culture existed at the Tuolumne County Sheriff's Department that "involved a pattern, practice and/or custom for supervisors ... to disregard appropriate compliance with applicable law and their own stated policies." FAC ¶ 22; *see also* FAC ¶ 29. To prevail on this theory, plaintiff had to prove "the existence of a widespread practice that ... is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Yet, apart from the few conclusory statements quoted above, the FAC contains no factual allegations from which a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity" can be inferred. The FAC focuses on a single arrest on a single day and provides no indication that similar conduct has occurred on other occasions. As noted in *Iqbal*, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. 129 S. Ct. at 1949. The FAC fails to assert a pattern and practice claim as to any of the alleged conduct.

### b.     Failure to Train.

Plaintiffs also argue that the FAC contains facts that suggest there is a "serious lack of training in the department's own policies which are designed to prevent the types of Fourth Amendment violations

suffered by Plaintiffs in this case." Doc. 11-1 at 13. Complete inadequacy of training may constitute a "policy" giving rise to *Monell* liability; however, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). Therefore, a claim of inadequate training is only cognizable under Section 1983 "where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id*. at 392.

A section 1983 plaintiff alleging a policy of failure to train peace officers must show: (1) he/she was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons' with whom its peace officers are likely to come into contact; and (3) his/her constitutional injury would have been avoided had the local government unit properly trained those officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007). "[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant-a much lower standard of fault than deliberate indifference." *Id*. at 484-85 (internal citations and quotations omitted). In short, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton,* 489 U.S. at 391. The required "deliberate indifference" is established where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Canton*, 489 U.S. at 390).

In order to prove that a failure to train amounts to deliberate indifference, it is "ordinarily necessary" to demonstrate "a pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). Plaintiffs fail to allege such a pattern here.

However, *Connick* also affirmed the validity of the so-called "single-incident" theory, finding a particular showing of "obviousness … can substitute for the pattern of violations ordinarily necessary to establish municipal liability." *Id*. at 1361. To qualify under this theory, a single violation of a protected

1  right must be a "highly predictable consequence" of a failure to train. *Id*. *Connick* reaffirmed the

2  viability of "single incident" failure to train liability earlier articulated in *City of Canton,* 489 U.S. 378.

3  In *Canton*, as an example of a circumstance in which a single incidence would trigger failure to train

4  liability, the Supreme Court discussed a hypothetical city that arms its police force with firearms and

5  deploys the armed officers into the public to capture fleeing felons without training the officers in the

6  constitutional limitations on the use of deadly force. *Canton*, 489 U.S. at 390 n.10. "The likelihood that

7  [a] situation will recur and the predictability that an officer lacking specific tools to handle that situation

8  will violate citizens' rights could justify a finding that policymakers' decision not to train the officer

9  reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice-namely, a

10  violation of a specific constitutional or statutory right. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v.*

11  *Brown*, 520 U.S. 397, 409 (1997). "The high degree of predictability may also support an inference of

12  causation-that the municipality's indifference led directly to the very consequence that was so

13  predictable." *Id*. at 409-10.

14      *Connick* itself dealt with the question of whether failure to train liability may be imposed upon a

15  district attorney's office based upon a single Brady violation. *Connick v. Thompson*, 130 S. Ct. 1880,

16  (2010) (mem.) (granting certiorari "limited to Question 1 presented by the petition"); *Connick v.*

17  *Thompson*, 2009 WL 3776259, *i (Nov. 6, 2009) (Petition for Writ of Certiorari setting forth questions

18  presented). In distinguishing *Connick's* facts from the example noted in *Canton*, the Supreme Court

19  found significant "the nuance of the allegedly necessary training." *Connick*, 131 S. Ct. at 1363. The

20  Supreme Court observed that "[t]he Canton hypothetical assumes that the armed police officers have no

21  knowledge at all of the constitutional limits on the use of deadly force." *Id*. In such a case, absence of

22  training leaves an officer with an "utter lack of an ability to cope with constitutional situations." *Id*. A

23  single-incident theory can arise in circumstances with "the complete absence of legal training that the

24  Court imagined in *Canton*." *Id*. (emphasis added). "[F]ailure-to-train liability is concerned with the

25  substance of the training, not the particular instructional format." *Id*. Deliberate indifference was lacking

26  in *Connick* because the plaintiff's theory was necessarily "that prosecutors were not trained about

1    particular Brady evidence or the specific scenario related to the violation in [his] case. That sort of

2    nuance [in training] simply cannot support an inference of deliberate indifference [.]" *Id.* "*Connick* thus

3    recognizes that *Canton's* single incident theory does not allow inquiry into subtleties of training. *Canton*

4    should not be read to infer deliberate indifference for failure to train after any violation, for 'in virtually

5    every instance' of a constitutional violation by a city employee 'a § 1983 plaintiff will be able to point to

6    something the city 'could have done' to prevent the unfortunate incident.' " *Wereb v. Maui Cnty.*, 830 F.

7    Supp. 2d 1026, 1033 (D. Haw. 2011) (quoting *Connick*, 131 S. Ct. at 1363).

8              [S]howing merely that additional training would have been helpful in making difficult
             decisions does not establish municipal liability. Proving that an injury or accident could
9            have been avoided if an employee had had better or more training, sufficient to equip him
             to avoid the particular injury-causing conduct will not suffice.

10   *Id.* at 1363–64 (quoting *Connick*, 131 S. Ct. at 1363-64.). Doing so would "provide plaintiffs or courts

11   carte blanche to micromanage local governments[.]" *Id.*

12             In *Wereb*, for example, a pretrial detainee died from complications related to alcoholism while in

13   the custody of defendant Maui County. *See Wereb v. Maui County*, 727 F. Supp. 2d 898, 903 (D. Haw.

14   2010) (discussing factual background). Plaintiffs, the decedent's parents, alleged Maui County gave

15   employees responsible for monitoring pretrial detainees no training on how to determine if detainees

16   were at risk for alcohol withdrawal. *Wereb,* 830 F. Supp. 2d at 1029. In light of the fact that Maui's

17   Police Chief, as well as many Maui Police Department employees, were aware that a large population of

18   homeless alcoholics lived in the area and frequented the police station where decedent had been

19   detained, "the failure to provide detainees with the right to medical care was an obvious consequence"

20   of Maui's assignment of the monitoring task to individuals who had no basic medical training and no

21   prior background in law enforcement or prisons.  *Id.* at 1029, 1034. However, plaintiffs' more specific

22   theory that Maui County should have trained the employees on the specific symptoms of alcohol

23   withdrawal "is too specialized and narrow" because "it could not have been patently obvious that

24   unconstitutional consequences would be a highly predictable result of a failure to train specifically on

25   alcohol withdrawal." *Id.* at 1035.

26

Here, the FAC acknowledges that Tuolumne County has specific policies regarding the application of handcuffs and the use of strip searches. *See* FAC ¶¶ 20 -21. According to the FAC, Pursuant to § 354.2 of the Tuolumne County Sheriff's Policy manual, when deciding whether to handcuff an arrestee, the deputy should carefully balance (emphasis added) officer safety concerns with factors including the following:

- The circumstances leading to the arrest.

- The attitude and behavior of the arrested person.

- The age, sex and health of the person.

- Whether the person has any other apparent disability.

FAC ¶ 20. The FAC alleges generally that Sheriff's Department personnel were "not <u>properly</u> hired, trained or supervised," FAC ¶ 23 (emphasis added), and more specifically that Defendant Vasquez breached the existing restraint policy, FAC ¶ 25. These allegations do not fall within the single incident framework, as they fail to allege a total failure to train on a broad subject of constitutional conduct. The fact that a single officer may have breached a standing policy does not infer deliberate indifference for failure to train.

The same can be said for Plaintiffs' allegations regarding the strip search. The FAC acknowledges that Tuolumne County Sheriff's Department had in place § 902.5 of the Tuolumne County Sheriff's Policy Manual, which outlines the department's strip search policy as follows:

a.      Pursuant to § 902.5 of the Tuolumne County Sheriff's Policy Manual, no person arrested and held in custody on a misdemeanor or infraction offense, except those involving weapons, possession of controlled substances or violence, shall be subjected to a strip search or visual body cavity search prior to placement in the general jail population, unless a deputy has determined that there is a reasonable suspicion based upon specific articulable facts to believe such person is concealing a weapon or contraband which would be discovered by such a search.  (Penal Code § 4030(f)).

b.      Pursuant to § 902.5, no strip search or visual body cavity search shall be conducted without prior written authorization from a supervisor.  The time, date and place of the search, the name and gender of the person conducting the search and a statement of the results of the search shall be recorded in the arrest record, and a copy of the written authorization and recorded information shall be retained and made available to the arrestee or other authorized representative upon request.

c.      Pursuant to § 902.5, all strip and visual body cavity searches shall be conducted under sanitary conditions and in an area of privacy so that the search cannot be observed by persons not participating in the search.  (Penal Code § 4030(m)).

d.      Pursuant to § 902.5, unless conducted by a physician or other licensed medical personnel, the deputy(s) conducting the strip search or visual body cavity search shall be of the same gender as the person being searched.  (Penal Code § 4030(l)).

e.      Pursuant to § 902.5, no employee should view an arrestee's private underclothing, buttocks, genitalia or female breasts while that person is showering or changing clothes unless the arrestee otherwise qualifies for a strip search.  However, if serious hygiene or health issues make it reasonably necessary to assist the arrestee with a shower or a change of clothes, a supervisor should be contacted to ensure reasonable steps are taken to obtain the arrestee's consent and/or otherwise protect the arrestee's privacy and dignity.

FAC ¶ 21. The FAC does set forth facts suggesting that this policy was breached, but nowhere suggests that employees received <u>no</u> training on this subject. *Connick* requires a showing that defendant "was on notice that, absent additional specified training, it was 'highly predictable' " that relevant employees would violate constitutional rights. *See Connick*, 131 S. Ct. 1366. To provide Defendants with adequate notice, Plaintiffs must do more than conclusorily allege that the County did not "properly train" its employees.

Defendants' motion to dismiss the Section 1983 claims against the County is GRANTED WITH LEAVE TO AMEND.

c.      **Fourteenth Amendment/ First Amendment.**

The FAC alleges that the strip search violated Michael Dillman's Fourteenth Amendment rights to "due process of law and equal protection, in that he and his son were both pre-trial detainees arrested on suspicion of the same non-violent misdemeanors… and yet only Plaintiff [Michael Dillman] was singled out to be subjected to the humiliating strip search and naked confinement…."  FAC ¶ 38. In addition, the FAC alleges Michael Dillman "was singled out for the degrading and humiliating strip search in part because he was an ordained pastor accused of a crime," in violation of his First Amendment right "to the free expression and observance of his religious convictions." *Id*. As to Defendant Tuolumne County, these claims fail for the reasons stated above. Plaintiffs have failed to satisfy *Monell*.

### 3.     Doe Defendants

The Complaint names 25 Doe Defendants and asserts the 1983 Claim against "all Defendants." The factual allegations do not suggest that any additional defendants were involved in Plaintiffs' arrest and transport. Accordingly, the Doe Defendants could only be involved in the strip search and related conduct at the Tuolumne County Jail.

Defendants do not address the viability of the strip search-related constitutional claims against the Doe Defendants. Doe defendants are permitted where federal question jurisdiction exists. *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (holding that "the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities").

## B.     State Law Claims.

### 1.     Immunity of the County for Injuries at the Jail.

California Government Code § 844.6(a) provides that "a public entity is not liable for ... [a]n injury to any prisoner." The term "prisoner" is defined by California Government Code § 844 to include:

> an inmate of a prison, jail, or penal or correctional facility. For the purposes of this chapter, a lawfully arrested person who is brought into a law enforcement facility for the purpose of being booked, as described in Section 7 of the Penal Code, becomes a prisoner, as a matter of law, upon his or her initial entry into a prison, jail, or penal or correctional facility, pursuant to penal processes.

Plaintiffs maintain that one does not obtain the status of a "prisoner" until after the booking process is complete, citing *Zeilman v. County of Kern*, 168 Cal. App. 3d 1174, 1181 (1985), which held that "it appears the line of demarcation between status as an arrestee and as a confined person is the completion of the booking process." Critically, *Zeilman* predated the amendment of § 844 in 1996 to include its second sentence, which clarifies that "a lawfully arrested person who is brought into a law enforcement facility for the purpose of being booked … becomes a prisoner…." Cal. Stats.1996, ch. 395, § 1. Plaintiffs' counsel either was unaware of or totally ignored a California Supreme Court case, *Teter v. City of Newport Beach*, 30 Cal. 4th 446 (2003), discussing the meaning of the amendment and

expressly rejecting Plaintiffs' position regarding *Zeilman*:[4]

> The legislative history of the amendment reveals that it was sponsored by the California State Sheriffs' Association (CSSA) because the CSSA "believe[d] that conflicting appellate court decisions may place public entities at risk of liability for persons injured while being taken into custody and booked." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1493 (1995–1996 Reg. Sess.) as amended Apr. 8, 1996, p. 2 (hereafter Senate Bill Analysis).) The Court of Appeal decision of particular concern to the CSSA was *Zeilman v. County of Kern* (1985) 168 Cal.App.3d 1174. (Sen. Bill Analysis, supra, at pp. 2–3.) At the time the arrestee in *Zeilman* fell and injured herself, the paperwork portion of the booking procedure had been completed, but she had not yet been fingerprinted or photographed. In her suit for personal injuries resulting from the fall, the trial court granted the county's motion for summary judgment based on Government Code section 844.6(a)(2). The Court of Appeal reversed. In the Court of Appeal's view, "the line of demarcation between status as an arrestee and as a confined person is the completion of the booking process" (*Zeilman*, at p. 1181) and, the Court of Appeal concluded, "a triable issue of fact exist[ed] as to whether the booking process was completed" (*id*. at p. 1183). The bill sponsored by the CSSA clarified that a lawfully arrested person who is brought into a law enforcement facility for the purpose of being booked becomes a prisoner, as a matter of law, upon his initial entry into the facility. (Sen. Bill Analysis, supra, at p. 2.)

*Teter*, 30 Cal. 4th at 454-55 (parallel citations omitted).

Plaintiffs' position is totally without support in the law. Tuolumne County is completely immune from liability under California law for injuries sustained by either Plaintiff during the booking process.[5] Therefore, Defendants' motion to dismiss all California claims against the County premised upon the strip search or conduct occurring within Tuolumne County Jail is GRANTED WITHOUT LEAVE TO AMEND, as amendment would be futile.

### 2. Section 52.1.

California Civil Code Section 52.1, known as the California Bane Act, addresses civil actions for protection of rights and remedies for violations of protected rights:

> (a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion,

---

[4] It is almost as troubling that Defendant likewise fails to mention *Teter*. This Court is too busy to do counsel's work. Counsel are reminded that failure to cite obviously controlling authority is sanctionable conduct.

[5] Plaintiffs also request judicial notice of Plaintiffs' booking photographs, which show that Michael Dillman was shirtless at the time his booking photograph was taken. Doc. 10. Plaintiffs offer this evidence in an effort to demonstrate that the strip search took place before the completion of the booking process and therefore that § 844 does not immunize the County in this case. Doc. 11-2 at 17. Because the timing of the strip search relative to the completion of booking is irrelevant to the applicability of § 844, the booking photographs are not relevant to resolution of this dispute. Therefore, the Court declines to entertain Plaintiffs' request for judicial notice.

with the exercise or enjoyment by any individual or individuals of rights secured by the
Constitution or laws of the United States, or of the rights secured by the Constitution or
laws of this state, the Attorney General, or any district attorney or city attorney may bring
a civil action for injunctive and other appropriate equitable relief in the name of the
people of the State of California, in order to protect the peaceable exercise or enjoyment
of the right or rights secured....

(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or
laws of the United States, or of rights secured by the Constitution or laws of this state,
has been interfered with, or attempted to be interfered with, as described in subdivision
(a), may institute and prosecute in his or her own name and on his or her own behalf a
civil action for damages ...

A section 52.1 plaintiff must demonstrate that the constitutional violation "occurred and that the

violation was accompanied by threats, intimidation or coercion within the meaning of the statute."

*Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1057 (E.D. Cal. 2009). "The essence of a Bane

Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or

coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under

the law or to force the plaintiff to do something that he or she was not required to do under the law."

*Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 883 (2007).

a.      **Threats, Intimidation, or Coercion.**

Defendants cite *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012), for the

proposition that the statute requires a showing of coercion independent from the coercion inherent in the

wrongful detention itself. Doc. 9-1 at 12. A recent Northern District of California case thoroughly

discusses *Shoyoye* and explains why it should not be read as requiring a separate showing of coercion:

Bane Act liability extends only to rights violations accompanied by "threats, intimidation,
or coercion." *See* Cal. Civ. Code § 52.1; *Venegas*, 32 Cal.4th at 843, 850–51 (Baxter, J.
concurring) (characterizing burden of showing "threats, intimidation, or coercion" as
minimal: "it should not prove difficult to frame many, if not most, asserted violations of
any state or federal statutory or constitutional right, including mere technical statutory
violations, as incorporating a threatening, coercive, or intimidating verbal or written
component").

Defendants here argue that, to adequately allege a Bane Act violation, Plaintiffs must
allege "threats, intimidation or coercion" separate and independent from the wrongful
conduct constituting the rights violation, citing *Shoyoye v. County of Los Angeles*, 203
Cal. App. 4th 947, 961 (2012). In *Shoyoye*, a computer error resulted in the unlawful
detention of a prisoner that had been ordered released. The *Shoyoye* court held that "the
statute requires a showing of coercion independent from the coercion inherent in the

1    wrongful detention itself." That court made clear that the basis of its holding was that
     plaintiff's evidence

2
          showed only that County employees were negligent in assigning to Shoyoye a
3         parole hold in the computer system, and in failing to detect the error during the
          subsequent quality control procedure.... Any intimidation or coercion that
4         occurred was simply that which is reasonable and incident to maintaining a jail.

5         *Id.* Distinguishing [*V]enegas*, the *Shoyoye* court observed that, in the former case,
     probable cause "eroded at some point, such that the officers' conduct became
6    intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with
     the plaintiffs' constitutional rights," whereas in the latter, "[t] he coercion was not carried
7    out in order to effect a knowing interference with Shoyoye's constitutional rights." *Id.*
     Defendants read *Shoyoye* to create a requirement in all Bane Act cases that constitutional
8    interference must be accompanied by "threats, intimidation, or coercion" separate and
     apart from the rights violation. Although "federal district courts interpreting *Shoyoye*
9    continue to disagree about its significance," *Cardoso v. Cnty. of San Mateo*, 2013 WL
     900816 (N.D. Cal. Jan.11, 2013), this Court agrees with other courts holding that, at the
10   pleading stage, the relevant distinction for purposes of the Bane Act is between
     intentional and unintentional conduct, and that *Shoyoye* applies only when the conduct is
11   unintentional. *See, e.g., Bass v. City of Fremont*, 2013 WL 891090 (N.D.Cal. Mar.8,
     2013).

12
          In *Bass*, the court sustained a Bane Act claim where the plaintiff's allegedly
13   unconstitutional "detention and arrest resulted from the officers' action, rather than their
     inaction." The court concluded that "*Shoyoye* is best viewed as a carve-out from the
14   general rule stated in *[V]enegas*. In *Shoyoye*, the plaintiff's overdetention resulted from
     the negligent inaction of administrators, whereas in *[V]enegas*, the defendant officer
15   engaged in a series of actions involving 'threats, intimidation, or coercion' that resulted
     in the plaintiff's unreasonable seizure and wrongful arrest." *Id.* at * 6–7. *See also Holland
16   v. City of San Francisco*, 2013 WL 968295 (N.D. Cal. Mar.12, 2013) (rejecting
     Defendants' Shoyoye argument because plaintiff alleged intentional, not unintentional,
17   interference with constitutional rights); *Skeels v. Pilegaard*, 2013 WL 970974, at *4
     (N.D. Cal. Mar.12, 2013) (distinguishing *Shoyoye* because plaintiff's alleged harms
18   "were not brought about by human error, but rather by intentional conduct, conduct
     which could be reasonably perceived as threatening, intimidating, or coercive"). *See also
19   Cardoso*, 2013 WL 900816, at * 1 (N.D. Cal. Jan.11, 2013) (denying motion to dismiss
     based on *Shoyoye* because plaintiff's Bane Act claim "may turn on details about the
20   alleged application of excessive force—details which are unavailable at this early stage in
     the litigation").

21
     *M.H. v. Cnty. of Alameda*, 2013 WL 1701591 (N.D. Cal. Apr. 18, 2013). The Court finds this reasoning
22
     to be persuasive. Where Fourth Amendment unreasonable seizure or excessive force claims are raised
23
     and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion
24
     independent from the coercion inherent in the seizure or use of force. This rule applies to Plaintiffs'
25

26

claims of arrest without probable cause, excessive force, and unreasonable strip search.[6]

Defendants' motion to dismiss the Section 52.1 claim on the ground that Plaintiffs have not alleged threats, intimidation, or coercion separate from the underlying alleged constitutional violations is DENIED.

**b.    Underlying Constitutional Violations.**

Defendants also argue that the Section 52.1 claims based upon the arrest and transport should be dismissed because "nothing occurred during either the arrest or the transport which could be deemed a violation of [] § 52.1." Doc. 9-1 at 12. However, as discussed above, many of Plaintiffs' federal constitutional claims survive dismissal. Those claims may form the foundation of a § 52.1 claim.

Defendants' motion to dismiss the Section 52.1 claim on the ground that there have been no underlying constitutional violations is DENIED as to any of the Section 1983 claims that survive dismissal and GRANTED as to those Section 1983 claims that have been dismissed.

**C.    Battery.**

The FAC alleges that Deputy Vasquez's conduct in handcuffing Plaintiffs amounted to battery under state law. In the context of a peace officer's use of force, "[a] state law battery claim is [the] counterpart to a federal claim of excessive use of force[,]" and similar standards apply. *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 & n. 11 (2009); *see also Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (1998) (applying the standards for a federal excessive force claim under § 1983 to a state law battery claim). Accordingly, Plaintiffs' state law battery claim against Deputy Vasquez survives to the extent their Fourth Amendment excessive force claim survives. Defendants' motion to dismiss the battery claim based upon Deputy Vasquez's handcuffing of Michael Dillman is DENIED, while the motion to dismiss the battery claim brought by Stephen Dillman is GRANTED WITH LEAVE TO AMEND.

---

[6] Plaintiffs Fourteenth Amendment and First Amendment claims against the Doe Defendants remain unchallenged by Defendants' motion to dismiss. Likewise, this Memorandum Decision and Order does not address whether those claims can form the foundation of § 52.1 liability.

D.      **Intentional Infliction of Emotional Distress.**

The Fourth Cause of Action is for intentional infliction of emotional distress against Defendant Vasquez and certain yet to be named "Tuolumne County Sheriff's Department jail personnel," based upon the arrest and transport of both Plaintiffs and the strip search of Michael Dillman.[7]

Under California law, "[a] cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (internal quotation omitted).

Defendants first argue that in order to establish a prima facie IIED claim, a defendant's conduct must either be intended to inflict injury or engaged in with the realization that injury will result. Doc. 9-1 at 14 (citing *Davidson v. City of Westminster*, 32 Cal. 3d 197 (1982)). This is not an accurate reflection of the legal standard, which requires either intent to cause emotional distress or an action undertaken with a reckless disregard of causing emotional distress. *See Hughes*, 46 Cal. 4th at 1060.

Plaintiffs next argue that neither Plaintiff has alleged extreme and outrageous conduct in this case. Where law enforcement officers' use of force is reasonable, such cannot constitute "outrageous conduct." *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest ... necessarily carries with it the right to use some degree of [reasonable] physical coercion ... to effect it."). "A defendant's conduct is outrageous only when it is so extreme as to exceed all bound of that which is usually tolerated in a civilized community." *Hughes*, 46 Cal.4th at 1050–51 (internal quotations omitted). Here, however, as discussed above, Plaintiff Michael Dillman has alleged facts sufficient to support an excessive force claim. Accordingly, Dismissal of Michael Dillman's IIED claim is not justified on this ground. *See Blankenhorn*, 485 F.3d 463 n. 17 (excessive force may constitute outrageous conduct and give rise to a

---

[7] This claim is asserted by both Michael and Stephen Dillman. Defendants do not address whether Stephen Dillman is a proper plaintiff, so the Court will not address that issue at this time.

1  claim for IIED); *Burns v. City of Redwood City*, 737 F. Supp. 2d 1047, 1067 (N.D. Cal. 2010) (denying

2  summary judgment on IIED claim where there was a genuine dispute as to whether the officers' use of

3  force was objectively reasonable).

4        The same conclusion is required for any IIED claim based upon the strip search. Plaintiffs

5  include "unnamed individuals" in their IIED claim. California Code of Civil Procedure section 474

6  permits a plaintiff to amend complaints by adding parties as Doe Defendants "[w]hen the plaintiff is

7  ignorant of the name of a defendant" at the time the complaint is filed. The FAC properly alleges that

8  Plaintiffs are heretofore ignorant of the identities of the jail personnel who allegedly participated in the

9  strip search. FAC ¶ 7. Defendants do not even suggest that the alleged strip search fails to state a claim

10  for IIED.

11        Defendants' motion to dismiss the IIED claim is DENIED as to all individual Defendants.

12  **E.      Negligence.**

13        The Fifth Cause of Action alleges a claim for negligence Deputy Vasquez and "certain yet to be

14  named administrative and supervisory personnel" based upon Deputy Vasquez's use of force and the

15  strip search at Tuolomne County Jail.

16        The elements of negligence are (a) a legal duty to use due care; (b) a breach of such legal duty;

17  and (c) the breach as the proximate or legal cause of the resulting injury. *Ladd v. County of San Mateo*,

18  12 Cal. 4th 913, 917 (1996). "Liability for negligent conduct may only be imposed where there is a duty

19  of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member." *J'Aire*

20  *Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979). A duty to the plaintiff is an essential element, which "may

21  be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." *Potter v.*

22  *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993).

23        Defendants argue that Deputy Vasquez owed no duty to Michael Dillman. However, it is well

24  established that police officers have a duty not to use excessive force. *See Munoz v. City of Union City*,

25  120 Cal. App. 4th 1077, 1101 (2004) (recognizing "a duty on the part of police officers to use

26  reasonable care in deciding to use and in fact using deadly force").

1    While the County itself is immune from liability due to California Government Code § 844.6,

2  Plaintiffs also direct the claim at "certain yet to be named individuals." Defendants do not even attempt

3  to suggest that Tuolumne County Jail personnel did not owe Michael Dillman a duty not to subject him

4  to an unlawful strip search.

5    **1.    Stephen Dillman's Negligence Claim.**

6    Defendants concede that a plaintiff can recover for emotional distress resulting from negligent

7  conduct that causes injury to a family member under either a "bystander" or "direct victim" theory.

8  *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1071 (1992):

9          The distinction between the "bystander" and "direct victim" cases is found in the source
           of the duty owed by the defendant to the plaintiff. The "bystander" cases … address "the
10         question of duty in circumstances in which a plaintiff seeks to recover damages as a
           percipient witness to the injury of another." [citation] These cases "all arise in the context
11         of physical injury or emotional distress caused by the negligent conduct of a defendant
           with whom the plaintiff had no preexisting relationship, and to whom the defendant had
12         not previously assumed a duty of care beyond that owed to the public in general."
           [citation] In other words, bystander liability is premised upon a defendant's violation of a
13         duty not to negligently cause emotional distress to people who observe conduct which
           causes harm to another.
14
           Because in such cases the class of potential plaintiffs could be limitless, resulting in the
15         imposition of liability out of all proportion to the culpability of the defendant, this court
           has circumscribed the class of bystanders to whom a defendant owes a duty to avoid
16         negligently inflicting emotional distress. These limits are … as follows: "In the absence
           of physical injury or impact to the plaintiff himself, damages for emotional distress
17         should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is
           present at the scene of the injury-producing event at the time it occurs and is then aware
18         that it is causing injury to the victim and (3) as a result suffers emotional distress beyond
           that which would be anticipated in a disinterested witness." [citation]
19
           In contrast, the label "direct victim" arose to distinguish cases in which damages for
20         serious emotional distress are sought as a result of a breach of duty owed the plaintiff that
           is "assumed by the defendant or imposed on the defendant as a matter of law, or that
21         arises out of a relationship between the two." [citation] In these cases, the limits
           [applicable to bystander cases] have no direct application. [citation] Rather, well-settled
22         principles of negligence are invoked to determine whether all elements of a cause of
           action, including duty, are present in a given case.

23  *Id*. at 1072-73 (internal citations omitted).

24    Defendants correctly note that the FAC fails to allege facts giving rise to a "direct victim" theory

25  of liability, as there is no indication that Defendants owed any duty directly to him related to the

26

31

1   treatment of his father. Direct victim cases involve fact patterns that are simply not present here. *See*

2   *e.g., Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 923 (1999) (a hospital and a doctor owed a

3   duty directly to the husband of a patient, who had been diagnosed incorrectly by the doctor as having

4   syphilis and had been told to so advise her husband in order that he could receive testing and, if

5   necessary, treatment).

6        Defendants also argue that the FAC does not allege facts sufficient to state a claim under a

7   bystander theory. It is undisputed that Stephen Dillman is closely related to Michael Dillman, his father

8   The FAC alleges he witnessed the strip search. FAC ¶ 52. Moreover, FAC alleges Stephen Dillman

9   suffered "severe emotional distress" from having to "helplessly watch as his father was brutalized and

10  humiliated." FAC ¶ 54. These allegations are sufficient to state a claim under the bystander theory.

11       Defendants' motion to dismiss the negligence claim is DENIED as to all individual Defendants.

12  **F.        California Penal Code Section 4030.**

13       The Sixth Cause of Action alleges that Defendant Tuolumne County and "certain yet to be

14  named individual defendants" violated California Penal Code § 4030, which sets forth policies and

15  practices which must be followed in conducting strip or body cavity searches of detained persons in

16  California. Because, as discussed above, California Government Code § 844.6 renders the County

17  completely immune from suit as a result of the strip search of Michael Dillman, so too the County is

18  immune from suit under § 4030. *Bull v. City & Cnty. of San Francisco*, 758 F. Supp. 2d 925 (N.D. Cal.

19  2010)(discussing the interplay between § 4030 and § 844.6 in detail and concluding that public entities

20  cannot be held liable for strip searches conducted on pretrial misdemeanor detainees, even if that search

21  violates § 4030).

22       Defendants' motion to dismiss the § 4030 claim against the County is GRANTED WITHOUT

23  LEAVE TO AMEND, as amendment would be futile.

24  //

25  //

26  //

32

1   **G.      Request For a More Definite Statement.**

2          In the alternative, Defendants request a more definite statement. Prior to filing a responsive

3   pleading, a party may move under Federal Rule of Civil Procedure 12(e) for a more definite statement of

4   a pleading if it "is so vague or ambiguous that the party cannot reasonably prepare a response." The

5   purpose of Rule 12(e) is to provide relief from a pleading that is unintelligible, not one that is merely

6   lacking detail. *Neveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1169 (E.D.Cal.2005). Where the

7   complaint is specific enough to apprise the responding party of the substance of the claim being asserted

8   or where the detail sought is otherwise obtainable through discovery, a motion for a more definite

9   statement should be denied. *See Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F. Supp. 940, 949 (E.D.

10  Cal. 1981) ("Due to the liberal pleading standards in the federal courts embodied in Federal Rule of

11  Civil Procedure 8(e) and the availability of extensive discovery, the availability of a motion for a more

12  definite statement has been substantially restricted."). Thus, motions pursuant to Rule 12(e) are

13  generally "viewed with disfavor and are rarely granted[.]" *Sagan v. Apple Computer, Inc.*, 874 F. Supp.

14  1072, 1077 (C.D. Cal. 1994).

15         Defendants request a more definite statement because Plaintiffs have pled multiple claims in

16  each cause of action and because the allegations relating to the two Plaintiffs are "inextricably

17  intertwined." Doc. 12 at 10. While it is true that the section 1983 claim is based upon several

18  constitutional violations, this is not at all unusual in 1983 practice. The FAC provides sufficient detail

19  for Defendants to frame a response. Likewise, while the FAC could have done a better job of isolating

20  the claims of each Defendant, Defendants had no trouble discerning the nature of these allegations for

21  the purposes of framing this motion to dismiss.

22         Defendants request for a more definite statement is DENIED.

23                              **VI. <u>CONCLUSION AND ORDER</u>**

24  For the reasons set forth above,

25  (1) Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART AS SET

26  FORTH ABOVE;

(2) Defendants' request for a more definite statement is DENIED; and

(3) Plaintiffs shall file any amended complaint within twenty (20) days of electronic service of this order.

**SO ORDERED**
**Dated: May 7, 2013**

**/s/ Lawrence J. O'Neill**
**United States District Judge**
