**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MICHAEL DILLMAN, an individual, and STEPHEN DILLMAN, an individual,** | 1:13-CV-00404 LJO SKO |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANT'S MOTION TO DISMISS (DOC. 16)** |
| v. | |
| **TUOLUMNE COUNTY, a political subdivision of the State of California; DEPUTY DAVID VASQUEZ, an individual, and DOES 1-25, inclusive,** | |
| **Defendants.** | |

# I. INTRODUCTION

This case concerns the September 18, 2011 arrest of Plaintiffs Michael and Stephen Dillman for alleged "joyriding" and related offenses in connection with their use of a thirteen-foot aluminum fishing boat on Lake Donnell, in Tuolumne County. The Complaint's first cause of action, brought under 42 U.S.C. § 1983, alleges that Defendants Tuolumne County (the "County") and Tuolumne County Sheriff's Deputy David Vasquez violated Plaintiffs' federal constitutional rights by, among other things: (1) subjecting both Plaintiffs to unreasonable force in connection with their arrest; (2) subjecting Michael Dillman to a strip search and other "outrageous humiliation" during the booking process; (3) and singling Michael Dillman out for such a "degrading and humiliating" strip search in part because he "was an ordained pastor accused of a crime." Doc. 15, Second Amended Compl. ("SAC"), at ¶¶ 39-46. The Complaint also contains the following related state law claims:

- Violation of California's Bane Civil Rights Act, Cal. Civ. Code § 52.1, against all Defendants (Second Cause of Action);

- Battery against Defendant Vasquez (Third Cause of Action);

- Intentional Infliction of Emotional Distress against Defendant Vasquez and "certain yet to be named individual defendants" (Fourth Cause of Action);

- Negligence against Defendant Vasquez and "certain yet to be named individual defendants" (Fifth Cause of Action); and

- Violation of California Penal Code § 4030 against the County and "certain yet to be named individual defendants" (Sixth Cause of Action).

SAC at ¶¶ 47-68.

The Complaint was originally filed in the Superior Court for the County of Tuolumne on February 13, 2013, but was removed by Defendants on March 18, 2013 pursuant to 28 U.S.C. §§ 1441(a) and 1446(a). Doc. 1. Defendants filed a motion to dismiss, Doc. 9, on March 19, 2013, and several claims were dismissed with leave to amend, Doc. 14. Plaintiff's filed their Second Amended Complaint on May 24, 2013. Doc. 15. The County now moves to dismiss. Doc. 16. Plaintiff opposes dismissal. Doc. 20. The County replied to the opposition. Doc. 22.

This motion was originally set for hearing on July 18, 2013, but the hearing was vacated and the matter submitted for decision on the papers pursuant to Local Rule 230(g). Doc. 23.

## II. **BACKGROUND**[1]

On September 18, 2011, after conducting Sunday morning service at his church in Manteca, Pastor Michael Dillman and his son, Stephen Dillman, drove to Lake Donnell in Tuolumne County, California, to go fishing. SAC ¶ 10. As was their custom and practice over the years, Plaintiffs placed their own motor on a thirteen-foot Valco aluminum boat at Lake Donnell. SAC ¶ 11. There was no registration, insignia, or identification on the boat. *Id*. According to Plaintiffs, for the last thirty years they and other fisherman have left aluminum boats moored at Lake Donnell. *Id.* It has been common practice to pack in one's own motor, place it on one of the moored boats, take the boat fishing, and then return the boat to the dock. *Id*. In fact, in or around 2010 Michael Dillman purchased an aluminum boat identical to the boat Plaintiffs used on September 18, 2011, and left that boat at Lake Donnell for his own use and for use by other fishermen. *Id*. Two aluminum boats purchased by Plaintiffs are moored

---

[1] These background facts are drawn exclusively from the SAC, the truth of which must be assumed for purposes of a Rule 12(b)(6) motion to dismiss.

currently at Lake Donnell. *Id*.

While Plaintiffs were out on Lake Donnell on September 18, 2011, an employee of Tri-Dam Project, the entity that operates the facility at Lake Donnell, called the Tuolumne County Sheriff's Department to report seeing two unidentified men place a motor on an aluminum boat that allegedly belonged to Tri-Dam Project. SAC ¶ 12. The men then took the boat out fishing. *Id*. The Tri-Dam Project employee viewed these events on surveillance cameras at Lake Donnell. *Id.*

After returning from fishing, Plaintiffs were met by Defendant Tuolumne County Sheriff's Deputy David Vasquez, who ordered them up a ladder at the dam facility and informed them they were under arrest for joyriding in a boat, trespass, and vandalism. SAC ¶ 13. Defendant Vasquez then handcuffed Plaintiffs with their hands behind their backs, in a "high, tight and painful manner." *Id.* Michael Dillman explained to Deputy Vasquez that he was a pastor, a community leader, and that he was unarmed and posed no threat to him. *Id*. Michael Dillman also explained to Deputy Vasquez that he was a Vietnam War veteran and suffered from Post-Traumatic Stress Disorder ("PTSD") and extreme claustrophobia. *Id.* At the time of the incident, Michael Dillman was 63 and suffered from arthritic shoulder pain, which was exacerbated by the high and tight handcuff placement behind his back. *Id.* Upon being cuffed, he began to feel pain immediately, which escalated to "an excruciating level." *Id.*

Michael Dillman pled with Deputy Vasquez to cite and release him and his son and to refrain from placing them into the back of the police vehicle with their arms cuffed behind their backs. SAC ¶ 14. Michael Dillman told Deputy Vasquez that he feared if he was placed in such a position in the back of a vehicle with the windows rolled up, he would suffer a PTSD episode. *Id.* He pled with Deputy Vasquez to loosen the cuffs to reduce the pain or to cuff him in front and to crack the window in the back of the vehicle so he could get air. *Id*. Deputy Vasquez finally agreed to "double cuff" Michael Dillman. *Id.* However, Michael Dillman's hands remained behind his back and the cuffs were extremely tight on his wrists. *Id*.

Plaintiffs were "shoved" into the back of Deputy Vasquez's vehicle and immediately transported to the Tuolumne County Jail in Sonora, California, over an hour drive from Lake Donnell. SAC ¶ 15. A

portion of the drive was on a bumpy road, and both men were cuffed behind their backs in an extremely painful manner. *Id*. Plaintiff Michael Dillman continued to plead with Deputy Vasquez to crack the window and loosen his handcuffs. *Id*. Instead of doing so, Deputy Vasquez cursed Michael Dillman and threatened to "hog tie his ass!" *Id*. Michael Dillman then suffered a "PTSD episode" during the transport to the Tuolumne County Jail. *Id*.

When Plaintiffs arrived at the Tuolumne County Jail they were cursed and humiliated by Tuolumne County Sheriff's Department personnel. SAC ¶ 17. Michael Dillman was then called a "psycho preacher" and was forced to completely undress in the presence of two female deputies, who openly commented on his nakedness. *Id*. Stephen Dillman was not strip-searched. *Id*. Michael Dillman was then separated from his son and placed naked in a small padded cell on cold concrete and given no way to cover his nakedness or protect himself from the cold. *Id*. After approximately two hours in that padded cell, Michael Dillman was returned to a holding cell with his son. *Id*.

Plaintiffs were released from custody at approximately 1:00 a.m. on September 19, 2011. SAC ¶ 18. According to Plaintiffs, Jail personnel refused to return money that had been confiscated from them during the booking process. *Id*. Instead, Plaintiffs were given a voucher card, which required them to wait until the banks opened in the morning before they could access any money. *Id*.

Tuolumne County chose to prosecute Plaintiffs, and a criminal jury trial commenced on February 6, 2012. SAC ¶ 19. Plaintiffs were acquitted of all charges. *Id*.

### III. STANDARD OF DECISION

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Simply stated, "a formulaic recitation of the elements of a cause of action will not do." *Id.* Thus, "bare assertions ... amount[ing] to nothing more than a 'formulaic recitation of the elements'... are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## IV. DISCUSSION

**A.    Section 1983 Claim.**

The First Cause of Action alleges that the County violated Title 42, United States Code, Section 1983 ("Section 1983"). SAC ¶¶ 39-46. Section 1983 creates a cause of action "against any person acting under color of law who deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). The SAC alleges the County violated Plaintiffs' First, Fourth, and Fourteenth

Amendments rights. SAC ¶¶ 42-43.

The County moves to dismiss any claims against it, arguing that Plaintiff has failed to satisfy the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), which provides that a municipality cannot be liable under § 1983 on a *respondeat superior* theory (i.e., simply because it employs someone who deprives another of constitutional rights). Rather, liability only attaches where the municipality itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694. Therefore, municipal liability in a § 1983 case may be premised upon: (1) an official policy; (2) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the act of an "official whose acts fairly represent official policy such that the challenged action constituted official policy;" or (4) where "an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

Plaintiffs do not use any of the four premises described in *Price*, but instead allege that "[m]ultiple civil rights offenses by multiple County employees creates [sic] a plausible inference of… a failure to properly train." Doc. 20, p. 5.

It is true that complete inadequacy of training may constitute a "policy" giving rise to *Monell* liability; however, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). Therefore, a claim of inadequate training is only cognizable under Section 1983 "where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id*. at 392.

A section 1983 plaintiff alleging a policy of failure to train peace officers must show: (1) he/she was deprived of a constitutional right; (2) the local government entity had a training policy that amounts to deliberate indifference to constitutional rights of persons with whom its peace officers are likely to come into contact; and (3) his/her constitutional injury would have been avoided had the local

6

government unit properly trained those officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). "[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant" which falls far short of the required deliberate indifference. *Id*. at 484-85 (internal citations and quotations omitted). In short, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton,* 489 U.S. at 391. The required "deliberate indifference" is established where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Canton*, 489 U.S. at 390).

### 1. Failure to Train – Pattern of Violations

In order to prove that a failure to train amounts to deliberate indifference, it is "ordinarily necessary" to demonstrate "a pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).

In this case, Plaintiffs attempt to characterize events which occurred on a single day as two separate incidents and further suggest that because multiple officers took part in the events of that day, there was a pattern of similar violations by the employees. Doc. 20, p. 6.

Plaintiffs cite *Tandel v. County of Sacramento*, U.S. Dist. LEXIS 21628 (E.D. Cal. Feb. 17, 2012), for the proposition that multiple acts of constitutional mistreatment from multiple personnel can constitute a pattern of similar violations. Doc. 20, p. 6. In *Tandel*, an inmate was allegedly subjected to a series of constitutional violations over a period of several weeks. *Tandel* at *4-8. The inmate was repeatedly denied medical attention for a condition that later severely disabled him, and was generally mistreated and ignored by multiple jail personnel over the several weeks in question. *Id. Tandel* is easily distinguishable from the instant case in that the incidents in *Tandel* were distinct from one another, occurred several days apart, and involved different personnel. *Id.*

In the instant case, the relevant events took place within the span of a single day, in one

unbroken series of events. Plaintiffs fail to cite, and this Court cannot identify any authority in which violations that occurred only a few hours apart, as part of the same arrest and detention, were considered separate incidents from which one could infer a pattern of violations. Adopting Plaintiffs' legal theory would blur the distinction between the single-incident and multiple-incident theories of liability for failure to train.

Plaintiffs also fail to cite any authority stating that multiple officers taking part in the same incident can satisfy the pattern necessary for a failure to train claim without first satisfying the much more stringent test for single-incident liability. The available authorities suggest otherwise. For example, in *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012), several security guards arrested a single casino patron who alleged constitutional violations occurred during the arrest. The *Tsao* court found that "the absence here of any evidence of a pattern makes it far less likely that Tsao can prove Desert Palace was 'on actual or constructive notice,' [citations omitted], that its policy would lead to constitutional violations." *Tsao*, 698 F.3d at 1145. This shows that, contrary to Plaintiffs' suggestion, the mere fact that multiple personnel were involved in an incident does not demonstrate a pattern of similar violations. *Compare Id.* with *De-Occupy Honolulu v. City & County of Honolulu*, 2013 U.S. Dist. LEXIS 71969 (D. Haw. May 21, 2013) (Multiple constitutional violations occurring in eight separate instances were sufficient to show a pattern of violations).

As Plaintiffs have failed to allege facts that could show a pattern of violations, this case must be analyzed under the single-incident theory of liability.

### 2. Failure to Train – Single Incident

*Connick* affirmed the validity of the so-called "single-incident" theory, finding a particular showing of "obviousness … can substitute for the pattern of violations ordinarily necessary to establish municipal liability." *Connick*, 131 S. Ct. at 1361. A May 7, 2013 order in this case summarized the relevant standard:

> To qualify under this theory, a single violation of a protected right must be a "highly predictable consequence" of a failure to train. *Id*. *Connick* reaffirmed the viability of "single incident" failure to train liability earlier

8

articulated in *City of Canton,* 489 U.S. 378. In *Canton,* the Supreme Court discussed a hypothetical in which a city deploys an armed police force into the public to capture fleeing felons without first training the officers in the constitutional limitations on the use of deadly force. *Canton*, 489 U.S. at 390 n.10.  This hypothetical was an example of a circumstance in which a single incidence would trigger failure to train liability. *Id.* "The likelihood that [a] situation will recur" as well as "the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights" are factors which could justify a finding that "policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). "The high degree of predictability may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable." *Id*. at 409-10.

*Connick* dealt with the question of whether failure to train liability may be imposed upon a district attorney's office based upon a single Brady violation. *Connick*, 130 S. Ct. at 1880 (mem.) (granting certiorari "limited to Question 1 presented by the petition"); *Connick v. Thompson*, 2009 WL 3776259, *i (Nov. 6, 2009) (Petition for Writ of Certiorari setting forth questions presented). In distinguishing *Connick's* facts from the example noted in *Canton*, the Supreme Court found "the nuance of the allegedly necessary training" to be significant. *Connick*, 131 S. Ct. at 1363. The Supreme Court observed that "[t]he *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." *Id*. In such a case, absence of training leaves an officer with an "utter lack of an ability to cope with constitutional situations." *Id*. A single-incident theory can arise in circumstances with "the complete absence of legal training that the Court imagined in *Canton*." *Id*. "[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Id*. Deliberate indifference was lacking in *Connick* because the plaintiff's theory was necessarily "that prosecutors were not trained about particular Brady evidence or the specific scenario related to the violation in [his] case. That sort of nuance [in training] simply cannot support an inference of deliberate indifference." *Id*. "*Connick* thus recognizes that *Canton's* single incident theory does not allow inquiry into subtleties of training. *Canton* should not be read to infer deliberate indifference for failure to train after any violation, for in virtually every instance of a constitutional violation by a city employee a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." *Wereb v. Maui Cnty*., 830 F. Supp. 2d 1026, 1033 (D. Haw. 2011) (quoting *Connick*, 131 S. Ct. at 1363) (internal quotations omitted).

[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability. Proving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice. *Id*. at 1363–64 (quoting *Connick*, 131 S. Ct. at 1363-64.).

> Doing so would "provide plaintiffs or courts carte blanche to micromanage local governments[.]" *Id.*
>
> In *Wereb*, for example, a pretrial detainee died from complications related to alcoholism while in the custody of defendant Maui County. *See Wereb v. Maui County*, 727 F. Supp. 2d 898, 903 (D. Haw. 2010) (discussing factual background). Plaintiffs, the decedent's parents, alleged that the Maui County employees who were responsible for monitoring pretrial detainees received neither basic medical training nor training on the risks of alcohol withdrawal. *Wereb,* 830 F. Supp. 2d at 1029. Maui's Police Chief, as well as many Maui Police Department employees, was aware that a large population of homeless alcoholics lived in the area and frequented the police station where decedent had been detained. *Id*. at 1029. The Court concluded that, "the failure to provide detainees with the right to medical care was an obvious consequence" of assigning the monitoring task to individuals who had a *complete* lack of medical training and therefore could pass the "single-incident" theory of liability. *Id.* at 1034 (emphasis added). However, plaintiffs' more specific theory that Maui County should have trained the employees on the specific symptoms of alcohol withdrawal was "too specialized and narrow" because "it could not have been patently obvious that unconstitutional consequences would be a highly predictable result of a failure to train specifically on alcohol withdrawal." *Id*. at 1035. Further, the department would then "face potential liability for any gap in training" which "is precisely the kind of micromanagement …that the Supreme Court has instructed courts to avoid." *Id.* at 1035-36.

Doc. 14, p. 19-21.

Here, the SAC acknowledges that Tuolumne County has specific policies regarding the application of handcuffs and the use of strip searches. SAC ¶ 20. As was the case in Plaintiff's initial complaint, Doc 1, Ex. A, the SAC does set forth facts suggesting that these polices were breached, but nowhere suggests that employees received <u>no</u> training on this subject. The most that the SAC says with regard to training is that the department was "underfunded, fractured, and had a hard time retraining[2] patrol officers," and that the department provided no "ethics training." SAC ¶ 25-26. The SAC fails to allege a <u>complete</u> lack of training with reference to handcuffs, strip searches, or constitutional rights. *Connick* requires a showing that defendant "was on notice that, absent additional specified training, it was 'highly predictable' " that relevant employees would violate constitutional rights. *See Connick*, 131

---

[2] The SAC quotes from a local newspaper article, incorporated in the SAC as exhibit 2. However, the article actually states that the department had trouble "retaining" officers not "retraining" them.

S. Ct. 1366. To provide Defendants with adequate notice, Plaintiffs must do more than make a conclusory allegation that the County did not "properly train" its employees. SAC ¶ 27.

Plaintiffs were previously afforded an opportunity to amend to cure this defect. Doc. 14, p. 23. They failed to do so. Defendant's motion to dismiss the Section 1983 claims against the County is therefore GRANTED WITHOUT LEAVE TO AMEND.

### 2. **Fourteenth Amendment/ First Amendment.**

The SAC specifically alleges that the strip search violated Michael Dillman's Fourteenth Amendment rights to "due process of law and equal protection, in that he and his son were both pre-trial detainees arrested on suspicion of the same non-violent misdemeanors… and yet only Plaintiff [Michael Dillman] was singled out to be subjected to the humiliating strip search and naked confinement…." SAC ¶ 43. In addition, the SAC alleges Michael Dillman "was singled out for the degrading and humiliating strip search in part because he was an ordained pastor accused of a crime," in violation of his First Amendment right "to the free expression and observance of his religious convictions." *Id*. As to the County, these claims fail for the reasons stated above. Plaintiffs have failed to satisfy *Monell*.

### B. **Section 52.1 Claim**

Defendant argues that the § 52.1 claim based upon the arrest and transport should be dismissed because "Plaintiffs have failed to allege facts demonstrating that the County committed any constitutional violation." Doc. 16-1, p. 7.

California Civil Code Section 52.1, known as the California Bane Act, addresses civil actions for protection of rights and remedies for violations of protected rights:

> (a) If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured....
>
> (b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state,

11

>has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages ...

A Section 52.1 plaintiff must demonstrate that a constitutional violation "occurred and that the violation was accompanied by threats, intimidation or coercion within the meaning of the statute." *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1057 (E.D. Cal. 2009). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal. App. 4th 860, 883 (2007).

In a May 7, 2013 order in this case, this Court stated that "there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force." Doc. 14, p. 27. The facts allege unreasonable seizure and excessive use of force against the officers, both of which imply coercion within the constitutional violation.  Since no independent showing of coercion is necessary, Plaintiffs may bring § 52.1 claims against the officers and the county may be held vicariously liable for those rights violations.

Defendant seems to argue that since none of Plaintiffs' § 1983 claims against the county survives dismissal, those claims cannot form the foundation of a § 52.1 claim, and therefore the § 52.1 claims should also be dismissed. Unlike § 1983 claims however, § 52.1 claims may attach to a government entity through *respondeat superior* liability. *Gant v. County. of Los Angeles*, 765 F. Supp. 2d 1238, 1249 (C.D. Cal. 2011). "California … has rejected the *Monell* rule and imposes liability on counties under the doctrine of respondeat superior for acts of county employees; it grants immunity to counties only where the public employee would also be immune." *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir. 2002). *See also Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013); *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010); *Megargee v. Wittman*, 550 F. Supp. 2d 1190, 1208

(E.D. Cal. 2008).[3] This means that Plaintiffs' § 52.1 claims need not meet the *Monell* standard, and can exist independently of any § 1983 claims against the county.

"A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity *within the scope of his employment* if the act or omission would … have given rise to a cause of action against that employee." Cal. Gov. Code § 815.2 (emphasis added). The facts alleged in the SAC give rise to the inference that the officers were acting within the scope of their employment during the arrest of Plaintiffs. As such, the County can be held liable for the constitutional violations of their employees under § 815.2. The SAC alleges sufficient facts to support a § 52.1 claim against the officers, and that those officers were allegedly acting within the scope of their duties. Defendant offers no reason why a § 52.1 claim should not continue against the County.

Defendant's motion to dismiss the § 52.1 claim on the ground that it fails to satisfy *Monell* is therefore DENIED.

## V. CONCLUSION AND ORDER

For the reasons set forth above,

(1) Defendant's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to the Section 1983 claims; and

(2) Defendant's motion to dismiss is DENIED as to the Section 52.1 claims.

IT IS SO ORDERED.

Dated:  **July 22, 2013**                            /s/ Lawrence J. O'Neill
                                                                  UNITED STATES DISTRICT JUDGE

---

[3] It is troubling that neither Plaintiffs nor Defendants cite to any of these authorities. The Court reminds Counsel that failure to cite obviously controlling authority is sanctionable conduct.

13